on whether there's any legal authority or evidence in the record that could support a finding that the petitioner did not default to take the claim. My answer to that would have to be no, I cannot find any evidence in the record to support a finding that the petitioner did not default to take the claim. I would say it wasn't defaulted because we know it was defaulted because of a procedural misstep in not attaching documents to the post-conviction review. We appreciate that candor. And that's a given on the record. However, when somebody is procedurally defaulted, there is authority to be able to hear the claim anyway. And one authority would be Coleman v. Thompson, when the defendant can establish cause and prejudice for the default, or Slut v. Delo, which allows the defendant to enter the gateway to have this court hear the claim based on a fundamental miscarriage of justice. I'll talk about the cause and prejudice first. It's true that a defendant does not have a constitutional right to counsel on post-conviction proceedings, collateral proceedings. However, there's an exception to that, and that is when the issue can be raised for the first time at that proceeding. Given that this was an ineffective assistance of counsel claim, that he didn't introduce or question the victim's mother about the tape messages, the Montana Supreme Court has indicated that unless something is patent on the record, as well as the United States Supreme Court in Massaro, that the proper place for ineffective assistance of counsel claims would be required in evidentiary hearing and, therefore, could be raised in a post-conviction proceeding. So given that posture of it, I think it's plausible to argue that Mr. Hansen was entitled to an attorney of record instead of a ghost attorney, and that it was that counsel's ineffective assistance that caused the procedural default and the prejudice from that would be. What would be the authority for that statement? Well, I extrapolated that from the one exception in Coleman that says if the issue can only be raised for the first time on appeal, that is the exception to no right to counsel. We have in this case a new attorney on the direct appeal. Correct. He wasn't the trial attorney, and he did raise several claims of incompetence of counsel, but he failed to raise the claim either for the weaver problem or for the tapes. So I've been struggling with whether that could then be said to be something that you could raise for the first time on appeal only in the collateral proceedings. It's true that appellate counsel did not raise the tape issue. She did raise the ineffective assistance because of character witnesses and failure to hold a reliability hearing on the juvenile, the child, and those issues were decided against Mr. Hansen by the Montana Supreme Court. I'm not so sure that the tape issue would have been in the same posture because one thing we know is that prior to trial, the government, Montana, filed a motion eliminate to exclude the tapes, and defense counsel responded to that motion by saying these are relevant. These indicate that the victim's mother, the animosity exhibited. And Judge Curtis ruled that actually she didn't rule. She said I'll leave that for at the trial. She ruled on several issues that were raised, but she did not rule on admission of the tape. She said we'll leave that until you, until it comes up. Well, it never came up. And contrary to what my client put in his pro se post-conviction and Federal Hague, I can find nowhere in the transcript where trial counsel ever said anything to Emmy about the tape messages. My client has indicated, well, it was there and there must be something wrong with the transcript, but I don't have any knowledge of where that was, so I'm going to say it was never brought up. I'm going to say that once defense counsel filed his response to the state's motion eliminate, saying these tapes need to come in, he never addressed that again. Was it ever raised in direct appeal or state habeas? That, about the tapes? No. Not a word. So. The first time it was raised was up here at this level. No, no, Your Honor, I'm sorry. It was raised in habeas, but it wasn't, on post-conviction, but it wasn't addressed because he didn't follow procedure. He didn't file procedure correctly. He didn't file any substantiating proof, right? Right. I mean. But definitely he didn't raise it. He raised it. Yes. He raised it? Yes. But it was procedurally defaulted at that point. So that only leaves me with. Was that, that was the Montana Supreme Court's, that's the decision that they. Oh, they affirmed Judge Curtis. Yeah. Saying, no, you didn't comply with 4621-104, so we're not going to hear that. Right. So then the same attorney that did the post-conviction did the federal habe, and it wasn't in there either. As a matter of fact, the first time it appears is in the pro se argument in support of the federal habeas petition. And at that juncture, that's when Magistrate Judge Erickson said, I've listened to these tapes. I think it raises the least suspicion that there might be something wrong, so I'm going to appoint counsel. And then we know that counsel. Counsel. Complied with that. Counsel, he did raise it in an attachment to the habeas petition. So it was there, but Judge Erickson didn't spot it the first time. But then when he brought it up in this letter, then it came to full attention. Right. Because Judge Erickson's final analysis was solely confined to Issue 1, the Weaver, and Issue 2, which had the character witness and I think the reliability hearing. That was it. And so when Mr. Hansen himself brought it up by communicating with this Court, this leaves me with either clause in prejudice or the fundamental miscarriage of justice, and I would like to move on to that, that particularly, which is, of course, the flagship authority for that is Schlafly-Velo that says, you know, if the evidence is sufficient to raise the probability that a rational juror presented with this evidence would not have a – would have a reasonable doubt as to the defendant's guilt. And this evidence, even though it's – the semantics say new, it doesn't mean newly discovered. It means newly presented to the jury. So we know the tapes are not newly discovered, but they're new for the jury. I assume that Your Honors have either read the transcript or listened to the tapes? Yes. We have, yes. Okay. Well, one thing stands out when you either read it or listen to it is that Hammy, if you will, follow that, was absolutely beyond reason angry. Her language was vile. It was disturbing to listen to. But if you listen to it real careful, there is contained within them, I think, at least evidence sufficient that would have raised a reasonable doubt in the juror's mind, jury's mind. And that is – and, Your Honor, I'm going to, for the cost of benefits, start with the transcript of tape one. And I'm not going to go through what it says. I'm going to pick out some parts that I think are relevant. But before I do that – How do you get around the procedural default? Pardon me? How do you get around the procedural default? The fundamental miscarriage of justice that – You have to show are you looking for actual innocence or are you looking for innocence here? Sotheby Delo doesn't stand for the proposition that it has to be – Sotheby Delo says that the evidence if presented to the jury would have raised a reasonable doubt as to the defendant's guilt and that this evidence can call into question a witness' credibility. That's enough to excuse a procedural default. If the evidence can show that it's more likely than not that the defendant didn't commit the crime, I believe so, yes. If these jurors would have heard this tape – in other words, if the jurors would have heard the tape, it's my argument that – It's not a new issue before the jury, though. The jury knew about this conflict between the mother-in-law and the girlfriend and the vindictiveness between the parties and their circumstances. They didn't have the tapes, but they knew of the circumstances between the parties. They knew that this was a very stormy, violent, argumentative, fought with, ups and downs, and fight. They knew that, yes. Did the defendant argue the vindictiveness before the jury? I think he did, didn't he? He alluded to the fact that there was animosity, but he gave no proof of that. And counsel's argument is not evidence. There was never any direct question to any. And isn't it true that you are so angry at Dale? I mean, they alluded to it, but there was never a direct question to her whether she had a motive or a bias to fabricate it. But I think the tapes reveal what wasn't said. And first off, I have to say that on cross-examination, child counsel asked Emi about questioning Aaron about the potential for abuse. And Emi's testimony is that she asked him once in the fall of 1992 when Aaron came back from Cheyenne. Because what had happened was Emi and Aaron moved out. She took Aaron to Cheyenne with her parents. She left Aaron there. It was summer vacation. And she came back to the area where Dale was, where she lived, and continued to see Dale. So on cross-examination, she does not allude to the fact that she thought there was sexual abuse in 1992. She said it started in 1993 in the fall. But across on page 110 of the transcript, her answer is to the question, did you ask Aaron about whether Dale had touched him or done anything inappropriate? She said, yes, I asked him once in the fall of 1992 when he came back from Cheyenne. Okay. And then she says that she did not bring it up again until 1993. Okay. So the tapes were made in the fall of 1993. I believe they're September. Okay. She didn't go to the police until March of 1994. In the tapes, Emi is furious. She's furious about Dale being with other women and all the sexual activities, either of her and what she is going to do. But she also said, this is the first recorded message, she says, and you chose Debbie again, you effing son of a bitch. You never, ever come to my son's games like you do hers. You're so effing damn loyal to Debbie. I hate you. You chose Debbie and her son, you son of a bitch, and you got your girlfriend Juanita. You don't come. You never wanted my babies. All you want to do is run around Debbie and watch your son. You would never come watch my son or support him. I was going to invite you to Toby's party this weekend. He's getting a trophy, but you chose Debbie and to go watch Chris because you're so effing loyal to her. Here we have a woman who testified that in 1992, she believed that she was suspected that Aaron had been sexually abused by Dale. A year later, she's now mad at this man that she thinks sexually abused her child because he won't come see him, because he won't spend time with him. That's incongruent with somebody who was suspicious that their 4-year-old had been irreparably harmed by Dale Hanson. She's mad because he won't spend time with the boy. There's not one word here about you effing son of a bitch, you sexually molested my child. I hate you, I hate you, I hate you. Not a word. The only thing she's mad about is because he's seeing another woman. We'll go on to the second message. And I must say I believe, but I don't know for certain, I think these messages were sequential in one day. There's nothing to tell me a date, so that's what I assume. She goes on again about this Debbie. You go to all her fucking Chris games and you don't go to my son's. You sit there and give me all this bullshit how you love my son and you just don't go see him. You're so full of shit. I can't believe you. You go, you effing go to her kids' games and then run around with her. You shut me up. Sitting there calling me, oh, I want to go away for the weekend. Let's go do something. Let's go take my son to this. Let's go see Jurassic Park. She is mad at him because he's ignoring her child that she thinks, if she's to be believed, sexually abused him. That defies any amount of logic. You would not want the sexual abuser to come to your son's games because she later on describes when she's describing what she did in 1994, what prompted her to go to the authorities was that Aaron was sweating the bed and hiding under the covers and wanted Dale to be squished like a spider and if he was a piece of paper, he wished he could rip him up. She wants, at this point, September 1993, the only thing that victim wants is to hurt Dale and she's mad at him because he's ignoring Aaron. And the last message, which is nothing but invective except for the second to last sentence where she says, I am going to effing get even. And I believe that these tapes, if the jury would have known that, if the jury would have heard this, that Emmy was not upset that Emmy's sole basis for fabricating these charges was because she was mad because Dale was never going to come back to her and that he wasn't still seeing her son. Because she indicated to the child that there was some rapport and you had to really sneak that out of the testimony because a lot of it was how he disciplined him and would let him put toys around the house. But there was some, Aaron did have some enjoyment with Dale. Now, we know that if I'm saying that Emmy's... Did you want to reserve any time for rebuttal? How much longer do I have? You have a minute and 37 seconds. When Detective Lamb went to interview Aaron the first time, Aaron's testimony to Detective Lamb said, I can't remember, I can't remember, I don't want to remember. It's my position that it was Emmy who coached Aaron on what he should remember, that the child didn't remember anything on his own. And the reason she did that is because she was going to get Dale and she used her son to do it. All right. We don't hear from the State. Good afternoon. My name is Carol Schmidt and I'm Assistant Attorney General representing the Pele, Mike Mahoney and the State of Montana. Before you start, could I ask you a question about his custodial status at this time? I believe he is still in prison because he was released. However, he refused to register as a sex offender and so he went back to Deer Lodge, Montana State Prison. Now, if he were to register or were excused from registering, he would be released. Is that right? Correct. Although now I believe he could, and maybe Ms. Mandu could answer this more clearly, but I think they're holding any charges against him until this proceeding is over. Because we received two letters the latest one in September which indicated kind of that, that he wanted this proceeding to continue because he would be subjected to being pre-incarcerated because he was not going to register as sex offender, according to what he told us. We continue to get these letters, so that's what we thought. Right, and I believe that is correct. As this Court is aware, the State District Court found that Mr. Hansen procedurally defaulted in his petition for post-conviction relief the issue of whether his trial counsel was ineffective. However, the State Court made that ruling on two bases. One was 46-21-104, which was the fact that he did not substantially support his claims. And that is really what the Montana Supreme Court then relied upon in its ruling. And at this juncture, Mr. Hansen is unable to demonstrate that he has cause for failing to substantiate his claims. He did file his petition pro se, although ostensibly he did have assistance from Mr. Sheehy, who was at that time contacted with the Department of Corrections for the purpose of assisting inmates on collateral matters. However, although it is considered pro se, even his lack of training is not considered cause. At this point, Mr. Hansen has not been able to suggest or provide any cause for his failure to substantiate his claims. Although this ruling also has to be firmly rooted and consistently applied, and in my research of the Montana Supreme Court rulings, the Court has first ruled on this in 1981 under Coleman v. State, in which the Court did say we will not address that claim because it has not been substantially supported. And this goes through. There's been a case in 1997, Montana v. Sullivan, and similar cases in which the Montana Supreme Court has applied this procedural default. That was our first ruling. In Coleman v. State? No, in this case. Oh, in this case. We held that already in our first opinion. Correct. But I think that was more on a procedural default regarding whether or not he could raise something on direct appeal after he never raised it in district court. So this is more on the Montana Supreme Court's rulings that, you know, they procedurally default based upon his failure to substantiate claims. I think that the district court or the trial court put it on two bases. Correct. That's failure to take it up on appeal and failure to attach, and the Supreme Court just did it on the basis of failure to attach any supporting evidence. Is that right? Correct. Although the Supreme Court did also state that there are many reasons the district court focused and procedurally defaulted, but the court, Montana Supreme Court, did just focus on the failure to substantiate the claims. Correct. I would like to next move on to the, unless this court has more questions regarding this area, I would like to move on to the fundamental miscarriage of justice. Of course, in order to prevail on the fundamental miscarriage of justice, Mr. Hansen has to demonstrate he is actually innocent of the crimes charged, and Mr. Hansen has the burden by recongruence of the evidence. Counsel, this case has been troubling to us, I guess, first because we were not sure that he'd been adequately represented by counsel on the habeas petition in the district court, but also the failure to introduce these tapes where the last word is, I'm going to get even. He insists that he's innocent. There was no witness to whatever went on except Aaron and Hansen. What more could he produce to show actual innocence? In lots of cases you find a real perpetrator or you find that the alibi was really true, things like that. Here, what more could he have induced? Your Honor, I know nothing in the record that he could have produced. However, in a case like this, he would need possibly the victim to come forward and say, you know, I really didn't happen, or maybe the victim's mother, or maybe someone that the victim's mother had talked to, and she says, I'm going to make sure I get blah, blah, blah, and I'm going to frame him, or I'm going to blah, blah, blah. You know, if she would have... Well, she said, I'm going to get him. Well, Your Honor, I have listened also to those tapes repeatedly, and they are very disturbing, and I will gladly admit that. However, when listening to those tapes several times, in every instance she says, you are a butterfly. You go and have sex with all these women. I don't care what happens to my body. I'm going to get even. I'm going to have sex with all these men. To me, the connotation is clearly she is going to get even by having sex with all these men, and not that there's no way on the tapes that she says, I'm going to get even by having my child fabricate criminal charges against you or anything to that indication. The indication is she is going to get even by having sex with men, and that will show him. And moreover, I think when listening to this tape, and it's very disturbing, and it's so present right now. However, I think this Court, of course, has to look at the entire evidence, has to look at the transcripts. We don't have the audio tape of the victim testifying or B-Roll testifying. We have the words, but we don't have the actual audio tape of that. And this tape cannot just be looked at, of course, by itself. It has to be looked at in the context of the entire transcripts and the entire evidence that the jury was presented with. And this is not the only evidence that showed that there was a stormy, hateful relationship near the end, that it was a horrible breakup. This is not the only evidence. And it is disturbing, but it does not meet, the State maintains, it does not meet the Schlupf standard that he is actually innocent of his crime. What was brought forward at trial relative to that relationship and relative to the possible vindictiveness? In other words, the tapes are over here. What happened at trial? Was the issue there, and how was it presented, if at all? Mr. Harbaugh, which is Mr. Hansen's defense counsel, brought in testimony actually from Mr. Hansen himself regarding their relationship and the fights that they had, and arguments that she was thrown out of the car or that she was thrown out by Mr. Hansen from the trailer park, from their home. But he rebutted it and said, no, I did not do that. You know, she left. It was, I did not throw him out. So there was different, you know, back and forth, just a stormy relationship of the affair or the relationship. So evidence of that was within the transcripts. The jurors did have the advantage to listen to these witnesses, and it is hard at this juncture, the State would maintain, to fully assess the entire demeanor of those witnesses at this stage. And the State maintains that the tape is not the only evidence. Was there any evidence at the trial that she had ever threatened to get even? I couldn't find it in the transcript. No, I just read it again last night, but I do not recall anything where she said she would get even. No, it only came on those tapes. The State maintains that whether to present this tape also could have been construed also as a matter of trial strategy, because once you presented that tape, there could have been other information that would have been brought up of showing Mr. Hansen's further participation in this relationship in his anger, vengeful way. So it just may have opened the door even more towards allowing more evidence. So it's not necessarily that this, the State again maintains, does not demonstrate that he was actually innocent of the crime. It was just another piece of evidence showing this relationship. Let me ask you a question which is kind of a part. The Montana statute requiring sex offenders to register, is that an absolute or are there possibilities for a waiver? No, I believe that that was part of the order also when he was sentenced, that he would have to, once he was paroled, he would have to register. The statutes do require that they must register if they are found convicted. That seems to be the one thing that's a real problem to him at this time. I understand. It is. The State maintains in this case that Mr. Hansen has not demonstrated cause for his procedural default, and that the tapes do not demonstrate that he is actually innocent of the crimes that he was charged with and convicted with by a jury. So unless this Court has a question. I did another collateral issue. As I said, we've received several correspondence from Mr. Hansen since we've issued our order. In one of those, there was a copy of a complaint, a handwritten complaint, a 1983 action, I believe, against the district attorney for bringing the case against him. And I don't know. It's hard to read. I read the whole thing. In all of his proceedings and letters to us, he's indicated that he's innocent, that the county and their prosecution used some very colorful words. I'm wondering, this is just sort of a wonder, because this case is very different. He files a 1983 against a prosecutor. I don't know if it's still pending. Let's suppose that succeeds. Does that have anything to do with anything in this case? Suppose it what? Suppose it succeeds. Now, suppose it's 1983. He said that my constitutional – it's sort of a collateral attack, very frankly, on his conviction. And according to his letters, if you read through them, it's like I'm innocent and no one will help me, so therefore I've got to sue the district attorney. It seems to be this thing has a life of its own. It never stops, I guess. I'm just curious, because we get – I've got a stack like this of things he sent us. Just for the record. It's not part of this record. Right. I'm talking to the district attorney. Right. Well, I haven't seen the 1983 complaint, so by going from just what you've told me, and hypothetically, I suppose if he succeeded and found that there was misconduct and that there was, you know, just to court, I mean, yeah, the prosecutors were – yeah, a lot of misconduct, that they railroaded him. I think that was one of his own words in one of them. Would that show he's actually – the only way I think he could get away from that is to show that he was actually innocent. Would that show that he's actually innocent? We have a problem with that with the 1983. I'm just – I just was kind of curious, because along with – because he did also fully brief us about his situation with regard to the sex offender registration. Are you in receipt of his handwritten correspondence? No, I am not. Okay. I have not received any of those. Those were all received during San Francisco in the file. They were received. They're not filed. They're not filed, but he sends them to us in significant numbers. No, I have not – I did get a copy of the tape about right after the last time that we were up here. I did get a copy of the tape, and he did write a letter to the attorney general, and I received a copy of that 2003 letter and tape, but that's the last writings that I have received from him. The last letter was in September of this year, and probably related to his relationship with his current lawyer, too. Well, I think he was quite right in saying that we were dilatory. Yeah, I think that's right. He said it rather powerfully. Well, and you guys have hopefully remedied that by having this oral argument expedited. Here we are. Yeah, here we are. But that question began in 1983. I just didn't know how much you knew about this, and I mean, I could – I was just arguing based upon the cause of prejudice and the fundamental miscarriage of justice, and those are what has been presented to me and what I have come to argue on behalf of the state. Thank you. I would like to ask you to communicate with your opposing counsel here. and see if there's any way that this case could be settled, if there was a possibility of his not being required to register, not finding a minister, something to stop this for all of us. If you could do that with co-counsel, that would be great. I'll have to go back and talk to my chief, Attorney General Mike McGrath, and I would have to consult because I do not have the power, of course, to do any of that stuff. And this is not – the court is not ordering you to do that. That's an inquiry. Right. It's just suggesting that this might be a way out for all of us. I will make any inquiries that I can and we'll see. But like I said, I have no power for that. We appreciate that. Thank you. Well, thank you very much. Thank you. Ms. Mundu, did you have any rebuttal? Mr. Hansen is in Flathead County Jail awaiting prosecution on a second subsequent failure register, which carries up to 40 years, I think. I've been in contact with his court-appointed counsel there, and Mr. Hansen wants a full hearing on whether he's convicted and whether he should register again. He now has new counsel, again, on a new charge or just regarding the registration? He's got court-appointed counsel from Montana on the failure to register state charge, which they supplemented the information to make it a second subsequent because Mr. Hansen had a sentence review with the Montana Supreme Court, which reduced the sentence to half, which meant, I think, under good time he was able to be released. It was something like $2,000, if you will. But he had to register, and he wouldn't do it. So if he could resolve the registration, it wouldn't all go away. They revoked his parole. Right, right. And charged him. So whether it was a formal charge, I'm not sure, but whatever it was gave the Montana prosecutor authority to charge it as a second subsequent this time. And to my knowledge, they are not putting a stay on it because I was asked if I would call the judge and ask him to stay it, and I said, I don't think the Federal court is going to intervene in the criminal laws of the state. And I didn't get a copy of the lawsuit. Even though I did fax the new counsel my motion to expedite and say, look, we're doing it October 19th, I haven't heard that they state it. And all the communication that Your Honors get, I don't get that either. Right. You don't get those either? No. I just got a copy of the malicious prosecution this week. They're lodged but not filed in San Francisco because he sends them to the court. Of course, he was represented, but we still received them nonetheless, even though they're not officially filed. We received them and we reviewed them. All he wants me to do is find out why it's not on a docket while we're going. Give me another docket. And I honestly can't keep up with what Mr. Hammond has. Anyway, he's on this docket. So he's here today. And thank you for your argument. I just have one last question. Where is Marana? Marana is right above Tucson. Oh, all right. It's at the United Circuit conference that you were at. Right. I know. I just didn't know where Marana was. I'd never seen that name. So thank you. It's in the northwest, right over the northwest border. Right. Thanks to both counsel. I just wanted to inform Your Honors that he is at the Flyhead County Jail. Right. That's what you had indicated. So we're putting this back to you folks to solve it. Mr. Hanson is quite unique in the respect that a lot of people will stand on principle but maybe capitulate when it gets a little bit too tough. I have not seen him veer, waver, stagger in any shape or form from his maintaining that he did not do this. And when I first got assigned this case and started reading this stuff, I felt like I was on the merry-go-round and I didn't know where it was going to dump me off at because I kept going in a circle on being effective and how can I get this issue in. But his resilience, if you will, made me keep trying. His letters speak for him. Yeah. And personally, I believe in his innocence. Whether he would – well, I think the registration aspect is probably a very high hurdle. I mean, I don't see getting him to agree to register. I don't see that at all. And I think that because he's been this resilient this long, he's going to maintain it. All right. Well, that's not something that the Federal court obviously is involved in. So with that, the case of Hanson v. Mahoney is submitted. Thank you both for your arguments.
judges: Fletcher, Brunetti, McKeown